J-A09035-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| BURLINGTON COAT FACTORY OF PENNSYLVANIA, LLC AND BURLINGTON COAT FACTORY WAREHOUSE CORPORATION, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| GRACE CONSTRUCTION MANAGEMENT COMPANY, LLC, | |
| Appellee | No. 2036 EDA 2013 |

Appeal from the Order Entered June 14, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): October Term, 2011 No. 001844

BEFORE:  BOWES, OTT, and JENKINS, JJ.

CONCURRING AND DISSENTING MEMORANDUM BY BOWES, J.:

**FILED SEPTEMBER 15, 2014**

I agree with my distinguished colleagues that BCF is not entitled to summary judgment as a matter of law based on the indemnification clauses in its contract with Grace.  Neither provision contains the "clear and unequivocal language" required to impose indemnification for the indemnitee's own negligence.  ***Ruzzi v. Butler Petroleum Co.***, 588 A.2d 1, 4 (Pa. 1991).

Grace does not dispute, however, that it agreed to indemnify BCF (but not BCFPA or BCFWC) against losses or claims to the extent Grace or its subcontractors or their employees were negligent or otherwise responsible.[1] Thus, whether BCF can ultimately prevail on the merits of its indemnification claim depends on whether it can prove that Grace and/or Eddis were sole or contributing causes of the harm to Mr. Eddis. The trial court concluded, and the majority agrees that, BCF failed to submit sufficient evidence that Grace or Eddis' negligence **caused** the latter's injury because it did not supply an expert report to that effect. The majority points out that Eddis' expert report in the underlying action "attribut[ed] the cause of the accident to BCF and Schindler while remaining silent about Grace."[2] Majority Memorandum, at 8. The majority continues that, with so many "potentially blameworthy actors," BCF's failure to file an expert report "dooms its action for contribution." *Id*. I respectfully disagree.

After a thorough review of the record and pleadings below, I do not believe that Grace asserted BCF's failure to submit an expert report as to

_____

[1] There is evidence in the record that Grace doubted the legitimacy of Mr. Eddis' claim. **See** Grace's Motion for Summary Judgment, Exhibit H (email dated October 1, 2012, from counsel for Grace to counsel for BCF).

[2] The expert's silence about Grace may be explained by the fact that the plaintiffs in the underlying action, Mr. and Mrs. Eddis, entered into a release with Grace "and/or other entities which has the effect of discharge[.]" **See** Grace's New Matter to Complaint Joining Grace as an Additional Defendant, ¶ 31.

causation as a ground for entry of summary judgment with sufficient specificity to place BCF on notice of its contention. Grace's only reference to the lack of an expert report is contained in ¶ 42 of its summary judgment motion: "As stated *supra*, the record is devoid of any expert report opining or establishing that Grace violated the standard of care of a general contractor or construction manager, or that Grace was negligent in any way." In its supporting brief, Grace proffered no argument or authority that an expert report was **required** to establish a *prima facie* negligence case and avoid summary judgment.[3] Yet, that is the rationale for the trial court's grant of summary judgment in favor of Grace and the majority's affirmance. Since the issue was not clearly asserted as the basis for summary judgment in the trial court, BCF was not placed on notice that it would be required to meet this allegation to avoid summary judgment.

I also believe the majority's reliance upon **MIIX Insurance Co. v. Epstein**, 937 A.2d 469 (Pa.Super. 2009), for its holding that an expert report was indispensable in this case, is misplaced. That contribution action arose out of a professional negligence action. The defendant physicians

_____

[3] Grace's brief is devoted to claims that the indemnity provisions were unenforceable because BCF contracted using its trade name; that operation, maintenance, and repair of the freight elevators was outside the scope of work; that BCF's voluntary settlement of the underlying action barred the indemnity claims; that the contract language did not provide indemnification for BCF's own negligence. **See** Defendant, Grace Construction Management Company, LLC's Motion for Summary Judgment.

were not sued in the original action. The trial court reasoned, and this Court agreed, that since the indemnity claims were actually claims of medical malpractice, and since a medical malpractice plaintiff generally must produce expert medical testimony to maintain such an action, expert medical testimony was required to maintain the indemnity action. We acknowledged therein that the ruling was consistent with well-established authority recognizing that because "the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson," a medical malpractice plaintiff generally must produce the opinion of a medical expert to demonstrate the elements of his cause of action." *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978). Expert medical opinion addressing the elements of a cause of action within a reasonable degree of medical certainty was necessary to establish a *prima facie* case and avoid summary judgment.

In Mr. Eddis' underlying action against BCF and Schindler, there were allegations that those defendants were negligent in the maintenance and upkeep of the freight elevator and, as a result, it malfunctioned and caused Mr. Eddis' injury. Mr. Eddis was required to furnish expert testimony to prove the applicable standard of care; causation could be inferred from the

facts surrounding the incident.[4] BCF was not required to produce an expert report disputing causation in the underlying action. In order to prove a right to indemnification, BCF must prove negligence on the part of Mr. Eddis or Grace or both and that such negligence caused or contributed to the injury. The causal connection between the elevator gate and the alleged injury was obvious. The real issue was whether the injuries were negligently inflicted and, if so, which party or parties were responsible. A jury of laypersons could look at the evidence and determine whether the injury resulted from BCF's negligent failure to maintain the elevator and/or Mr. Eddis' admitted failure to press the elevator's stop button as instructed or his failure to adhere to Grace's safety instructions to obtain assistance when using the elevator.

When determining whether Grace is entitled to summary judgment, we view the record in the light most favorable to BCF, the non-moving party. If there are genuine issues of material fact regarding the cause of Mr. Eddis' injuries, summary judgment is not proper. I believe that BCF, who admittedly bears "the burden of proof at trial," has raised genuine issues of

_____

[4] Had the action been brought in strict liability against the elevator manufacturer, evidence that the product malfunctioned would have supplied circumstantial proof of a defect. **See Wiggins v. Synthes (U.S.A.)**, 29 A.3d 9 (Pa.Super. 2011) (patient was not required to present testimony that orthopedic screws were defective under the malfunction theory as the jury could infer the existence of a defect from circumstantial evidence that they broke).

material fact that warrant submission of that issue to a jury. *See* Pa.R.C.P. 1035.2(2). Although there was evidence the elevator's alarm bell did not sound or that the safety shoe mechanism did not retract upon contact, which arguably implicated BCF, that evidence was controverted. Furthermore, there was evidence suggesting that Mr. Eddis' negligent operation of the elevator caused or at least contributed to his injury. Additionally, there was evidence that Grace failed to enforce workplace safety rules and supervise its subcontractors and their employees when it permitted workers like Mr. Eddis to operate the freight elevator.

Kevin Cromwell, BCF's loss prevention officer, testified in his deposition that he taught Mr. Eddis and others how to operate the elevator. Mr. Cromwell showed the group the run/stop switch, and demonstrated its importance.

> In fact, at that moment once we stepped on the elevator, I put on the stop. I explained to everyone in the room that the reason for the stop switch is to hold that elevator open on that floor where you are. And the only way the elevator can move is if you take it off that stop and put it in the run mode and then you would have to push whatever the designated floor you wanted to go to, you would push that button to whatever floor you will go to. And the elevator in turn will respond to you. Once you take it out of stop and put it into run [,] the inner door and outer door will close, and the elevator will take you to your designated floor you want to go to.

Deposition of Kevin Cromwell, 5/24/12, at 20. He also cautioned them not to stand in the pathway of the door and reinforced that the elevator had to be in stop mode during the loading or unloading process. *Id*. at 21, 26. Mr.

Cromwell stayed on the elevator with Mr. Eddis and the others while they demonstrated for him that they understood how to use the elevator properly. *Id*. at 30.

Mr. Cromwell explained that the gate inside the elevator was equipped with a mechanism that reversed itself upon contact with an obstruction. The expert in the underlying case against BCF and Schindler called this a safety shoe mechanism that automatically reversed the direction of the closing gate upon impact.[5] Mr. Cromwell also explained how the warning bell worked. "It would ring to let you know to stand clear of the door." *Id*. at 37. Once the elevator was placed into run mode and a floor selected, the bell would ring before the doors closed. *Id*. at 38. The expert confirmed that, based upon his subsequent inspection of the freight elevator, the alarm bell would ring for several seconds before the metal gate came down inside the elevator car and the two external vertical doors closed. Expert Report, J. Pablo Ross, P.E., 8/31/12, at 5.

After Mr. Eddis apprised him of the accident, Mr. Cromwell prepared a written report setting forth Mr. Eddis' account of the accident. He

_____

[5] The expert noted in his report that, at the time of his investigation, the elevator also was equipped with a proximity edge mechanism that consisted of a set of infrared beams that detected an obstruction in its path and which would prevent the gate from closing until the obstruction was removed. That device had not been installed on the freight elevator in question when the alleged injuries occurred herein. Expert Report, J. Pablo Ross, P.E., 8/31/12, at 6.

telephoned and then expedited the report to BCF's insurer. Subsequently, he was able to access and view video surveillance of the incident. Since there was no audio with the video, he was unable to discern whether the bell sounded to indicate that the elevator gate was closing. However, he described how Mr. Eddis entered the elevator with a wheelbarrow, and then exited and reentered the elevator a second time with his back to the elevator entrance. As he did so, Mr. Eddis pressed a button designating his destination floor, and the inner gate of the elevator came down on Mr. Eddis' mid-back region and went back up. Mr. Cromwell testified that as Mr. Eddis entered the elevator, it was in the run mode rather than the stop mode, and that by pressing the floor button, Mr. Eddis activated the closing of the door upon himself. The video depicting the accident was subsequently lost due to a power brownout.

Mr. Eddis admitted that Mr. Cromwell instructed him in the operation of the elevator. More importantly, Mr. Eddis conceded that, on the day of the accident, he did not press the stop button to keep the elevator doors open while he was loading. I believe that Mr. Cromwell's testimony that he instructed Mr. Eddis to press the stop button, Mr. Eddis' admission that he did not do so, together with evidence that Mr. Eddis pressed the button designating a floor and triggered the closing of the gate, support the

competing inference that Mr. Eddis was causally negligent.[6]  Thus, there were genuine issues of material fact as to Mr. Eddis' role in producing his injury that should have been submitted to a jury.

In addition, there were controverted factual issues, which depending on their resolution could have wholly undermined the expert's opinion that the elevator malfunctioned.  Mr. Cromwell testified that the freight elevator was working properly both before and after the incident, and that on that particular day, the warning bell was functioning before the inside gate closed.  Furthermore, the expert's conclusion that the safety shoe mechanism did not operate properly, which was based on Mr. Eddis' account that it pinned him against the wheelbarrow, was controverted by Mr. Cromwell.  He testified that the video surveillance depicted reversal of the gate immediately upon contact with Mr. Eddis' back.  In sum, I agree with BCF that there is sufficient evidence, if credited by the jury, to support a finding that Mr. Eddis' negligent operation of the freight elevator rather than an elevator malfunction was the cause of his injury.  At the very least, Mr. Eddis' admission that he did not press the stop button created a genuine issue of material fact as to whether his negligence was a cause of his injury.

_____

[6]  Mr. Eddis' stated that he could not recall Mr. Cromwell instructing him to use the stop button when loading and unloading the freight elevator.  Based on this testimony, expert J. Pablo Ross concluded that Mr. Cromwell failed to instruct Mr. Eddis to use the stop button when loading or unloading the elevator, a fact that is controverted.  **See** Expert Report, J. Pablo Ross, P.E., 8/31/12, at 11.

Additionally, Grace was contractually responsible for workplace safety and the freight elevators provided the only access to the floors where the work was being performed. Mr. Arthur Snellbaker, Jr. testified that he was Grace's project manager and that his responsibility was on-site supervision. Deposition, Arthur G. Snellbaker, Jr., 9/19/12, at 19, 24. He acknowledged that the store manager for BCF trained him in the operation of the freight elevators and asked that workers seek out Kevin Cromwell if they needed to use the elevators. However, Mr. Snellbaker knew that the subcontractors and their employees used the elevators without his assistance or that of BCF personnel. When he observed them violating the safety rules, his response was to "yell at them." *Id*. at 58. One could reasonably find based on such testimony that Grace's failure to enforce its own safety standards and/or properly train or supervise its subcontractors and their employees caused or contributed to Mr. Eddis' injury.

For the foregoing reasons, I believe that the evidence of record was sufficient to create a genuine issue of material fact as to whether Grace, Mr. Eddis, or BCF, or any combination thereof, were negligent, and whether that negligence caused the injury. No expert report regarding causation was mandated. As the trial court realized, the "duty to indemnify cannot be determined until the relative fault for Mr. Eddis' accident is decided." Trial Court Opinion, 6/14/13, at 4-5. Since that issue is not "clear and free from

doubt," summary judgment should not have been granted on this basis. **Washington v. Baxter**, 719 A.2d 733, 737 (Pa. 1998).

Since I do not find BCF's lack of an expert report to be dispositive of Grace's motion for summary judgment, I must briefly address the other grounds asserted by Grace that the majority did not reach. Grace alleged that BCFPA and BCFWC, the defendants in the underlying action, were not contracting parties entitled to indemnification. Furthermore, Grace contended that the omission of these entities from the contract was a unilateral mistake on BCFWC's part and equitable relief is not warranted. Moreover, Grace maintains that it cannot be subject to liability for breach of contract for failing to name the other entities as additional insureds on the insurance policy.

BCF counters that BCFPA and BCFWC operate under the licensed trade name of Burlington Coat Factory, and that these entities were the true parties-in–interest to the contract. It provided proof of licensing in opposition to the motion. It maintains further that parties may enter into binding contracts using trade names. **See Dodge v. Williams**, 47 Pa.Super 302 (1911). BCF relies upon two district court cases applying Pennsylvania law, **ASCO Healthcare Inc. v. County of Chester**, 2000 WL 3485757 at *3 (E.D. Pa. 2000) and **Fabral, Inc. v. B&B Roofing Co., Inc.**, 2011 WL 4528362 (E.D. Pa 2011), in support of its contention that the real parties-in-interest are the proper parties to enforce the contract.

We note that BCF did not assert that Grace breached the contract by failing to obtain insurance designating BCFPA or BCFWC as additional insureds.[7]  Furthermore, CNA did not base its denial of a defense and coverage on the discrepancy between the named additional insured, BCF, and the parties seeking coverage.  This is a red herring.  Additionally, as the alleged real parties-in-interest under the contract, I believe BCFPA and BCFWC have a colorable right to seek enforcement of the indemnity provisions, and Grace has not supplied persuasive authority to the contrary.  Grace's unilateral mistake analysis is inapposite.  Hence, Grace is not entitled to summary judgment as a matter of law on this issue.

Grace also contends that since its scope of work did not include operation, maintenance, servicing or repair of the freight elevators, it cannot be subject to indemnity for injuries caused by the malfunctioning of the freight elevator doors.  For the reasons *infra*, it is not clear that the freight elevator doors malfunctioned as there was also evidence of Mr. Eddis' negligence in operating the elevator.  Furthermore, there is evidence from which a jury could conclude that Grace assumed responsibility under the contract for workplace safety, and that use of the freight elevators by the contractor, subcontractors, and their employees was contemplated to

---

[7] The alleged breach was Grace's failure to obtain primary coverage on its behalf.

accomplish the work. Given the underlying factual issues, summary judgment is not warranted on this basis.

Thus, I would reverse the grant of summary judgment in favor of Grace and remand for further proceedings.